IN THE  UNITED  STATES  DISTRICT  COURT
FOR THE  SOUTHERN  DISTRICT  OF  ALABAMA
SOUTHERN  DIVISION

AUDRA D. LUMPKIN,               :
                                :
        Plaintiff,              :
                                :
v.                              :     CIVIL ACTION 05-0523-KD-M
                                :
JO ANNE B. BARNHART,            :
Commissioner of                 :
Social Security,                :
                                :
        Defendant.              :


REPORT AND RECOMMENDATION


In this action under 42 U.S.C. § 405(g), Plaintiff seeks judicial review of an adverse social security ruling which denied a claim for disability insurance benefits. The action was referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  Oral argument was heard on June 20, 2006.  Upon consideration of the administrative record, the memoranda of the parties, and oral argument, it is recommended that the decision of the Commissioner be reversed, that this action be remanded, and that judgment be entered in favor of Plaintiff Audra D. Lumpkin and against Defendant Jo Anne B. Barnhart.

This Court is not free to reweigh the evidence or substitute its judgment for that of the Secretary of Health and Human Ser-vices, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983), which must be supported by substantial evidence.  *Richard-son v. Perales*, 402 U.S. 389, 401 (1971).  The substantial evi-

dence test requires "that the decision under review be supported by evidence sufficient to justify a reasoning mind in accepting it; it is more than a scintilla, but less than a preponderance." *Brady v. Heckler*, 724 F.2d 914, 918 (11th Cir. 1984), *quoting Jones v. Schweiker*, 551 F.Supp. 205 (D. Md. 1982).

Plaintiff was born August 6, 1973.  At the time of the administrative hearing, Lumpkin was thirty-one years old, had completed some post high school education (Tr. 528; Doc. 9 Fact Sheet),[1] and had previous work experience as an accounting clerk, receptionist, and production coordinator (Tr. 140-41).  In claiming benefits, Plaintiff alleges disability due to Diabetes Mellitus with complications (Doc. 9).

The Plaintiff filed a protective application for disability benefits on May 16, 2003 (Tr. 64-67).  Benefits were denied following a hearing by an Administrative Law Judge (ALJ) who determined that Lumpkin was capable of performing past relevant work as an account clerk, a receptionist, an orthodontic assistant, and a production coordinator (Tr. 20-44).  Plaintiff requested review of the hearing decision (Tr. 11) by the Appeals Council, but it was denied (Tr. 7-10).

Plaintiff claims that the opinion of the ALJ is not supported by substantial evidence.  Specifically, Lumpkin alleges

---

[1]Plaintiff got her Graduate Equivalency Degree and then completed a home study accounting course (*see* Doc. 9, Fact Sheet).

that:  (1) The ALJ did not properly consider the opinions and diagnoses of her treating physicians; (2) the ALJ improperly discounted her testimony of pain and limitation; and (3) she is incapable of performing light work (Doc. 9).  Defendant has responded to—and denies—these claims (Doc. 19).

Plaintiff's first claim is that the ALJ did not accord proper legal weight to the opinions, diagnoses and medical evidence of her treating physicians.  Lumpkin specifically references Drs. McDaniel and Nipper.  It should be noted that "although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981);[2] *see also* 20 C.F.R. § 404.1527 (2005).

Dr. John M. Nipper is an internist, specializing in nephrology, who first saw Lumpkin on January 7, 2002,[3] at the request of Plaintiff's obstetrician/gynecologist for the treatment of diabetic proteinuria (Tr. 252, 313, 316, 522).  As

---

[2]The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[3]Though this note—and some others which follow it—predate Plaintiff's asserted disability onset date of August 7, 2002, the Court finds it necessary to set out Lumpkin's lengthy medical history to show the extreme difficulties she endured.

part of the medical information Lumpkin provided, the doctor noted an onset of diabetes mellitus at the age of five and that she had been on an insulin pump for the previous one and one-half years; the pump had lowered her blood sugars from greater than twenty percent to less than ten percent (Tr. 252). After examination, Nipper diagnosed proteinuria in the nephrotic range consistent with prior renal disease and possible mild renal insufficiency, diabetes mellitus for twenty years with neuropathy, increased blood pressure, and a high-risk pregnancy; the doctor prescribed lab work, close monitoring, and medication.

On January 24, 2002, Plaintiff was admitted to University of South Alabama (hereinafter *USA*) Hospital for four nights for complications related to her pregnancy which included nausea, vomiting and diarrhea, a urinary tract infection, dehydration, and blood sugars in the 400-500 range[4] (Tr. 147-49). Lab work from February 27 indicated that Plaintiff's glucose was 379 and her creatinine[5] was 1.2 (Tr. 396).

On March 4, 2002, Dr. Nipper noted a blood sugar level of 379, but found her renal insufficiency to be stable (Tr. 251). Two days later, however, Lumpkin received intravenous hydration and antiemetics at USA Hospital (Tr. 153-55). On March 14,

---

[4]Glucose—or blood sugar—levels normally measure between 65 and 110 (Tr. 461).

[5]The creatinine blood test is used to assess kidney function. *See* http://www.labtestsonline.org/understanding/analytes/creatinine/test.html. Creatinine levels normally range from 0.8 - 1.2 mg/dL (Tr. 461).

Plaintiff was admitted to USA Children's and Women's Hospital (hereinafter *C&WH*) for two nights for prolonged nausea and vomiting as well as elevated blood sugar (Tr. 156-58).  On March 28, 2002, Lumpkin was again admitted to USAC&WH, this time for a week, to treat for gestational hypertension, severe preeclampsia, pulmonary edema, class F diabetes, gallstones, and anemia; after undergoing a Cesarean section to have her baby, Plaintiff was discharged home in stable condition (Tr. 159-61).  Lab results from April 25 demonstrate a glucose level of 59 and a creatinine of 1.4 (Tr. 396).

On April 29, Dr. Nipper noted Lumpkin's complaints of leg swelling and pain since delivery; Plaintiff gave a history of blood sugars as being mostly less than 200 (Tr. 249-50). Following examination, the doctor diagnosed her to suffer from chronic renal insufficiency, secondary to diabetic nephropathy as well as hypertension, diabetes, and atypical edema of the lower extremities, probably secondary to her medications.  Lab results from May 16 reveal a glucose of 466 and a creatinine of 1.6 (Tr. 396).

Plaintiff was admitted to Mobile Infirmary Medical Center (hereinafter *Infirmary*) on May 23-24, 2002 for gallstone symptoms (Tr. 162-75).  Lumpkin had a video laparoscopic cholecystectomy with fluoroscopy intraoperative cholangiogram and a tubal ligation performed while hospitalized.

On July 21, Plaintiff was admitted to Providence Hospital
for two nights for treatment of diabetic ketoacidosis, poorly
controlled type 1 diabetic mellitus, and proteinuria; a secondary
diagnosis was nephritis and nephropathy (Tr. 176-86).  Lumpkin's
blood sugar, on admission, was 526 (Tr. 179).  Dr. Huey G.
McDaniel, an internist specializing in the treatment of diabetes,
assisted in her treatment (Tr. 177, 315).

Plaintiff was seen by Dr. Joseph B. Ray, an orthopedic
surgeon, on September 19, 2002, for problems with her left hip
(Tr. 308-09, 317).  The doctor noted tenderness in the left
sciatic notch, calf, adductor tendon near its attachment to the
pubic ramus, and hip flexor origin.  She had no hip flexor
contracture; external rotation was more bothersome than internal
rotation.  The lumbar spine was normal on x-ray though there was
a slight anomalous formation of the arch of the fifth vertebra;
there was also, maybe, a slight retroslippage of L3 on 4.  The
pelvis was not perfectly fixed in neutral position, slightly
rotated.  Dr. Ray's diagnosis was dysfunction of the left hip
joint secondary to injury; he recommended an MRI and physical
therapy as an evaluation tool and therapy.  An MRI of the hips,
two days later, was negative (Tr. 260); an MRI of the lumbar
spine demonstrated "minimal early changes of degenerative disc
disease at L3-4 and 4-5 with tiny broad based bulge in the
central canal at L4-5 which [did] not appear to be significant"

(Tr. 261).

An examination by Grelot Physical Therapy on September 20, 2002 demonstrated what appeared to be mild scoliosis (Tr. 256-57).   Lumbar flexion was 60% of normal; hip range of motion was severely limited because of pain.   The therapist further noted "severe (3+/3) tenderness over the ASIS and PSIS, the Rectus femoris and the inguinal ligament.   The adductor musculature and the lateral hip musculature are also very tender (3/3) to palpation.   There is some mild tenderness (1/3) in the lumbar spine" (Tr. 257).   Though physical therapy was planned for three-to-four weeks, it was discontinued "because of other medical problems" (Tr. 254, 257).

On November 11, Lumpkin was admitted to Providence Hospital for three nights for treatment of diabetic ketoacidosis, gastroenteritis, and hypoxemia (Tr. 187-200).   Her blood sugar in the emergency room was over 700 (Tr. 190).   Dr. McDaniel assisted with Plaintiff's treatment during this hospitalization (Tr. 192-93).   Lumpkin was to be examined by endocrinologists on discharge to help her with the reinstitution of her insulin pump (Tr. 188).

On November 25, 2002, Dr. Nipper's notes indicate that Plaintiff reported having blood sugars in the 400-600+ range over the previous several days; he noted some muscle tenderness in both paraspinous muscles in her lower back into her sacral area (Tr. 246-48).   The doctor noted a blood sugar percentage of

7

twelve percent.  His impression was as follows:  diabetic nephropathy, with known renal impairment; severe diabetes, brittle, and difficult to control; suboptimally controlled hypertension; mild anemia, and suboptimally controlled proteinuria.  Lumpkin's medications were adjusted and she was referred to Dr. McDaniel.

On December 5, Dr. McDaniel examined Plaintiff in his office and noted sinus tachycardia and decreased sensation in her feet; his diagnosis was insomnia, diabetes, and chronic renal failure (Tr. 278).  He also noted that she was under a lot of stress in caring for her children, a six-year old with scoliosis in a full-body cast and a one-year old.

Lab results requested by Dr. Nipper dated December 8 reveal a glucose level of 525 and a creatinine of 1.6 (Tr. 396).  Dr. Nipper saw Lumpkin on January 27, 2003 and noted her stress in caring for her children; her youngest had been diagnosed with aortic stenosis and required catheterization with angioplasty at the University of Alabama in Birmingham (Tr. 244-45).  The stress was, mostly, tiring Plaintiff.  The patient noted that her glucose levels were up and down.

On February 10, Lumpkin saw Dr. McDaniel who noted that she would be undergoing a hysterectomy soon as she was experiencing

pelvic pain which Darvocet[6] had not abated (Tr. 276-77).
Plaintiff reported blood sugars in the range of 200-300; it was
256 on that examination.  The doctor adjusted her medications and
prescribed an upgraded insulin pump.

On February 24, 2003, Lumpkin was admitted to Spring Hill
Memorial Hospital for three nights during which she underwent a
"[t]otal abdominal hysterectomy, bilateral salpingo-oophorectomy"
performed by Dr. Judy Corbett (Tr. 202; *see generally* Tr. 201-
11).  Following the surgery, it was noted that Plaintiff's blood
sugars were unstable (300-400) and that her pump was
dysfunctional (Tr. 204, 211).

Lab results from April 13 ordered by Dr. Nipper reveal a
glucose of 185 and a creatinine of 1.5 (Tr. 396).  May 16 lab
work demonstrated a glucose of 466 and a creatinine of 1.6 (Tr.
240).

On May 16, Dr. McDaniel wrote a letter summarizing Lumpkin's
medical history and stating that "[s]he has some renal
insufficiency related to her diabetes and will probably need a
renal transplant in the foreseeable future because of renal
failure" (Tr. 212).  The doctor concluded his remarks by saying
that Plaintiff was "unable to work because of her chronic renal

---

[6]Propoxyphene napsylate, more commonly known as Darvocet, is a
class four narcotic used "for the relief of mild to moderate pain" and
commonly causes dizziness and sedation.  *Physician's Desk Reference*
1443-44 (52nd ed. 1998).

insufficiency, labile diabetes mellitus type 1, hypertension, and autonomic neuropathy along with her peripheral neuropathy." *Id.*

During an examination on May 30, 2003 by Dr. Nipper, Lumpkin stated that she was still experiencing stress because of her children's health; additionally, she was experiencing "dramatic swings in her glucose within any given day" in spite of using an insulin pump (Tr. 242-43). The doctor noted "some tenderness to deeper palpation along her paraspinous muscles from the mid to lower thoracic spine, and to the upper lumbar spine area" (Tr. 242). Her glucose was 466. Nipper's impression was that Plaintiff was suffering from "[g]radually progressive chronic renal insufficiency secondary to diabetic nephropathy" and that her diabetes was "brittle, with some heavier glycosuria and some trace ketonuria" (Tr. 243). The doctor adjusted her medications. Lab results dated June 9 showed a glucose level of 120 and a creatinine of 1.3 (Tr. 279).

Also on May 30, 2003, Dr. Nipper wrote a letter which stated as follows:

> Ms. Lumpkin is a 29-year-old woman who has long-standing type 1 diabetes mellitus which has been extremely brittle. She has had hypertension and complications of her diabetes, which include neuropathy and gradually progressive chronic renal insufficiency. She has also had hypertension, which has recently been suboptimally controlled. Her diabetes control has been followed by Dr. McDaniel, and has been very difficult, as she has been

10

> very brittle and stress has aggravated this.
> She has also had children who have had
> significant health problems, which have been
> a distracting factor in her health care.
>       She continues to have gradual
> progression in her renal impairment.  We are
> trying to slow this, but she appears to be
> slowly moving towards eventual renal failure.
> She may ultimately need evaluation for
> hemodialysis or transplantation.  We will
> continue to work with her medical therapy to
> try and slow this from happening.

(Tr. 421).

When Lumpkin was examined by Dr. McDaniel on June 6, she complained of being cold, back pain, and that the insulin she was using was clogging up her pump (Tr. 274-75).  The doctor found Plaintiff's thyroid to be enlarged about three times and diagnosed her to have a goiter; he changed her insulin and provided her with Prozac[7] samples.  Her glucose level was 120 (Tr. 279).

Lumpkin was examined by Dr. Ray again on July 7, 2003 for complaints of increasing lower back pain and left anterior hip pain (Tr. 254-55).  The doctor noted that lumbar flexion was 50% of normal and that extension was more limited at 20%; there was "severe (3+/3) tenderness to palpation of the inguinal ligaments on the left.  The left SI join, lumbar paraspinal and Quadratus lumborum muscles [were] also severely tender.  There [was]

---

[7]*Prozac* is used for the treatment of depression.  *Physician's Desk Reference* 859-60 (52nd ed. 1998).

moderate (2/3) tenderness of the right SI and lumbar area as
well" (Tr. 254).   Ray also noted that SI provocation tests were
very painful and that the left pubic bone was higher than the
right.   Noting that his exam a year earlier revealed SI landmarks
in a totally different position than the current exam, the
doctor's impression was that she had an unstable SI joint; he
noted that "a lot of soft tissue dysfunction in the pelvis and
lumbar area [] undoubtedly contribute[] to the lumbar pain" (Tr.
255).   Dr. Ray recommended physical therapy three times a week
for four weeks.   The evidence demonstrates that Plaintiff went to
seven sessions over the next two weeks, though the meaning of the
notes is indecipherable (Tr. 422-26).

An MRI, on July 12, 2003, of the pelvis and both hips
revealed no abnormalities (Tr. 259).   An MRI of the lumbosacral
spine revealed multiple Schmorl's nodes in the lower dorsal and
upper lumbar regions, degenerative disc disease with mild annular
disc bulge at the L4-5, and mild hypertrophic changes of the
facet joints without significant spinal stenosis (Tr. 258).

On August 8, Plaintiff told Dr. McDaniel that her "diabetes
[had] not been doing well," that she had been unable to eat, had
had headaches, and had been vomiting (Tr. 272-73).   Examination
revealed large cervical adenopathy on both sides of the neck as
well as tenderness, decreased sensation in her feet, and
decreased grip in her hands.   The doctor provided medications for

12

a respiratory infection and noted her unfulfilled request for more Prozac.  Lumpkin's blood sugar was 277.

On August 18, 2003, Plaintiff told Dr. Nipper that she was stressed in anticipation of her 16-month-old daughter's upcoming surgery for valvular heart problems; she was still experiencing back pain, headaches, and nausea (Tr. 280-81).  The doctor noted chronic back pain using agents other than nonsteroidals and changed her hypertension medications.

Lumpkin saw Dr. Ray, on October 8, who noted that head compression was uncomfortable in neutral and slight flexion but intolerable in extension; she was also tender along the posterior part of the mid portion of the neck to palpation (Tr. 304-05). An MRI showed that the L4-5 was bulging and that another one probably was as well; Dr. Ray suspected that her lumbar spine was the source of her pain.  The doctor further noted the Schmorl's nodes in her back and probable imperfect union and formation as well as a lack of complete fusion of the posterior elements at L5.  Dr. Ray noted that her insurance would not pay for physical therapy and that provocative diskography could help diagnose her pain.  His diagnosis was degenerative disc disease of the lumbar at several levels as well as chronic soft tissue strain of the neck "demonstrated by loss of normal cervical lordotic curve and frequent headaches and pain in the neck and suprascapular areas of her shoulders" (Tr. 304-05).  Eight days later, Dr. Ray

13

referred Lumpkin to Dr. Fleet for surgical consultation (Tr. 303).

On October 21, 2003, Dr. William S. Fleet, an internist specializing in gastroenterology and board certified in psychiatry and neurology, evaluated Plaintiff prior to her back surgery (Tr. 287-89, 314).  Fleet diagnosed her to have lumbar radiculitis, hypertension, insulin dependent diabetes mellitus, and migraines; he prescribed Imitrex.[8]

On October 23, 2003, Dr. Ray performed provocative diskography at four levels which demonstrated internal herniation of the L3-4 disc; the other three levels were normal (Tr. 290-300).  Ray performed an endoscopically-assisted microdiscectomy at L3-4.  Plaintiff was discharged the next day.

Three days later, Lumpkin was admitted to Providence Hospital, through the emergency room, for nausea and vomiting (Tr. 318-33).  Her blood sugar on admission was 738 (Tr. 319).  Following treatment with insulin and IV fluids, she was released the next day.  Lab results dated October 27 showed a blood sugar level of 734 and a creatinine level of 1.8 (Tr. 331).

On October 29, Dr. Ray noted that Plaintiff stated that her leg did not feel normal though she was not complaining of pain (Tr. 302).  He prescribed a crutch.

---

[8]*Imitrex* is "indicated for the acute treatment of migraine attacks with or without aura."  *Physician's Desk Reference* 1036-37(52nd ed. 1998).

Lumpkin returned to Providence emergency room the next day, October 30, 2003, for nausea, vomiting, and dehydration; she was admitted to the hospital and treated for diabetic ketoacidosis (Tr. 334-51).  Plaintiff's glucose was 727 on admission; her creatinine was 2.0 (Tr. 336); she was hospitalized for three nights.

On November 7, Lumpkin told Dr. Ray that the surgery had helped her but that she was having pain in her left hip (Tr. 301).  He noted that she was "tender in the left subgluteral bursa, left hip adductor muscles and less so along the greater trochanteric bursa;" the doctor also noted tension in her hamstrings (*id.*).  Dr. Ray resisted giving her a cortisone shot because of her brittle diabetes; instead, he suggested that she continue to use the crutch.

On November 13, 2003, Dr. McDaniel completed a medical source statement in which he stated that Lumpkin was incapable of performing sedentary work on a regular and continuing basis (Tr. 310-12).  He further indicated that his patient's symptoms would distract her from adequately performing daily activities, that physical activity would increase the severity and degree of her symptoms such that she would not be able to work on a sustained basis for an eight-hour day, and that medication side effects could be expected to be severe and limit her effectiveness in working.  McDaniel stated that Plaintiff was markedly limited in

15

her ability to deal with stress and that she would require three-to-four unscheduled breaks, for ten-to-twenty minutes each, during an eight-hour day were she to attempt a day's work; Lumpkin would also, likely, miss more than three days of work a month because of her impairments.  The doctor also stated that although she had good and bad days, her impairments had lasted for more than twelve months.

On December 10, Plaintiff indicated to Dr. Nipper that her blood sugar was in the 200-300 range but was not changing acutely (Tr. 394-05).  Her glucose was over 500 on that day.  The doctor characterized her diabetes as chronically brittle.  On December 11, Dr. Nipper wrote a letter to Dr. McDaniel indicating that Lumpkin should "continue to avoid nonsteroidals due to her already significant diabetic nephropathy and the use of Captopril and diuretics increasing her chances for nephrotoxicity from nonsteroidals" (Tr. 393).

On January 9, 2004, Plaintiff saw one of Dr. McDaniel's partners for a respiratory infection for which he prescribed a Z-pack (Tr. 401-02).  Three days later, however, she was admitted to the Infirmary for treatment of diabetic ketoacidosis (Tr. 377-87).  Her blood sugar was reported to be "too high to measure" (Tr. 378); lab results, however, showed her glucose to be 590 and her creatinine to be 1.6 (Tr. 380, 382).   Following treatment with IV fluids and insulin, she was discharged the next day.

On March 22, 2004, Plaintiff went to the Infirmary ER for acute myofascial strain and chronic low back pain (Tr. 367-75). She was treated with Demerol[9] and Phenergan.[10]  Her blood sugar was 503 (Tr. 375).

Lumpkin returned to Dr. Fleet on April 6, 2004, complaining of increased pain in her lower back and hip (Tr. 415-16). Plaintiff reported blood sugar levels in the 600 range.  Fleet prescribed Lortab,[11] a traction neck brace, a hard back brace, and moist heat.  On that same date, the doctor ordered a lifetime cervical collar and body jacket for her cervical and lumbar radiculitis (Tr. 131).

On April 19, Lumpkin was examined by Dr. William L. Hall, a non-board-certified general practitioner at the request of the Social Security Administration (hereinafter *SSA*) (Tr. 352-58, 365, 520).  Hall noted full range of motion in the cervical spine but that her lumbar spine was limited, perhaps 25%, particularly in rotation and extension.  The doctor noted tenderness in the para lumbar musculature.  Dr. Hall stated that he considered the medical evidence provided by the SSA, but did not state what that

---

[9]*Demerol* is a narcotic analgesic used for the relief of moderate to severe pain.  *Physician's Desk Reference* 2570-72 (52nd ed. 1998).

[10]*Phenergan* is used as a light sedative.  *Physician's Desk Reference* 3100-01 (52nd ed. 1998).

[11]*Lortab* is a semisynthetic narcotic analgesic used for "the relief of moderate to moderately severe pain."  *Physician's Desk Reference* 2926-27 (52nd ed. 1998).

evidence was.  Lab work revealed a fasting blood sugar of 156 and a creatinine of 1.6 (Tr. 354, 355A).  The doctor completed a physical medical source opinion in which he indicated that Plaintiff could six four, walk five, and stand six hours at a time but could sit five, walk six, and stand eight hours during an eight-hour day; he suggested that she could lift and carry five pounds constantly, ten pounds frequently, and fifteen pounds occasionally, but never more than twenty-five pounds.  Dr. Hall further indicated that Plaintiff could push and pull with arms or legs, kneel, crouch, handle, finger, feel, and hear on a constant basis, but could stoop and reach overhead only frequently and climb, balance, and crawl only occasionally.  The doctor indicated that he did not rely primarily on Lumpkin's subjective complaints in reaching these conclusions (Tr. 358).

On April 21, 2004, Plaintiff was examined by Dr. Andre J. Fontana, an orthopedic surgeon at the request of the SSA; he stated that he reviewed the medical evidence provided to him, but did not state what that evidence was (Tr. 359-64, 519).  On examination, Fontana noted that cervical spine flexion was 45 degrees, extension was 35 degrees, rotation was 55 degrees to the right, 50 degrees to the left, and flexion was 25 degrees to the right and left.  He noted that toe-heel gait was good; lumbar spine flexion was 40 degrees, extension was 15 degrees to the right, 15-20 degrees to the left, and extension 15 degrees.

18

There was decreased patella reflex in the left leg and Achilles. The doctor noted good range of motion, with no pain, in the hips. Dr. Fontana's impression, after looking at x-rays, was that Lumpkin suffered from lumbar radiculopathy and possible peripheral neuropathy as well as mild osteoarthritis of the hips. The doctor completed a physical capacities evaluation in which he indicated that Plaintiff could sit, stand, or walk for two hours at a time and up to eight hours during a day (Tr. 363). He stated that she could lift up to 25 pounds continuously, fifty pounds frequently, and one hundred pounds occasionally; the doctor further indicated that she could carry up to twenty pounds continuously, twenty-five pounds frequently, and fifty pounds occasionally. Fontana found her capable of simple grasping and fine manipulation on both the right and left and capable of pushing and pulling of arm and leg controls; she could also frequently bend, squat, crawl, and climb but could reach on a continuous basis. The doctor further stated that she was limited to light to medium activities.

Plaintiff was examined by Dr. McDaniel on May 3, 2004 for a cold (Tr. 398-400). She reported that she was in cervical traction five hours a day and was still having pain in her hips. Her blood sugar was 450. McDaniel noted that the decreased sensation in her feet had moved up to below her knees. Lab work dated May 10 revealed a glucose of 402 and a creatinine of 1.7

(Tr. 440).

On June 7, 2004, Lumpkin went to the Infirmary ER for lower back pain for which home medications provided no relief (Tr. 445-50).  She was given injections of Demerol and Phenergan.  Her blood sugar was 402 (Tr. 449).

The next day, Plaintiff returned to Dr. Fleet, complaining of pain in her hip, legs, and neck (Tr. 409-10).  A lower extremity nerve conduction study revealed neuropathy (Tr. 411). Dr. Fleet prescribed Methadone.[12]  On June 9, Dr. Fleet completed an application for disability parking on Lumpkin's behalf, stating that she was severely limited in her ability to walk because of "an arthritic, neurological, or orthopedic condition;" he also indicated that this was a long-term disability (Tr. 438). On July 7, Lumpkin told Dr. Fleet that Methadone caused nausea and that she had fallen down some stairs, causing right leg pain and increasing that which already existed in her lower back (Tr. 407-08).  Dr. Fleet prescribed a TENS unit and physical therapy; her blood sugar was 400 (Tr. 417).

Plaintiff had four treatments at the Physical Therapy Center of Mobile between July 16-23, 2004 to aid in her back, neck, and hip pain (Tr. 428-36).  Lumpkin characterized her pain as 8 on

---

[12]*Methadone* "is indicated for relief of severe pain, for detoxification treatment of narcotic addiction, and for temporary maintenance treatment of narcotic addiction." *Physician's Desk Reference* 2548 (52nd ed. 1998).

the first day on a ten-point scale.  Notes indicate that she
could perform hip flexion and abduction on the right at 3+/5
though it was very painful; knee flexion and lumbar flexion were
both 4/5 on the right (Tr. 434).  On the left side, hip flexion
was 4+/5 while lumbar flexion was 4/5 (*id.*).  All other range of
motion measurements were normal.  During her treatment, Plaintiff
underwent electric stimulation, traction, and manual therapy.

On August 2, 2004,[13] Lumpkin saw Dr. McDaniel who admitted
her to Providence Hospital for three nights to treat her
uncontrolled diabetes with chronic pain and neuropathy (Tr. 454-
63, 480-81).  It was noted, on admission, that her medications,
Methadone and OxyContin,[14] did not relieve her pain (Tr. 456);
physical examination showed that reflexes were especially
hypoactive though absent at the ankles or toes down (Tr. 459).
Her blood sugar was 287 and her creatinine was 1.7 (Tr. 461).
She was treated with Wellbutrin[15] and Neurontin[16] (Tr. 456-57).

---

[13]Plaintiff indicates in her brief that Dr. Fleet prescribed
Oxycontin instead of Methadone on September 1, 2004 (Doc. 9, p. 24;
*cf*. Tr. 502-03).  The Court notes that Fleet considered such an
action, but it is not clear from the record that he actually took it.

[14]"*OxyContin* tablets are a controlled-release oral formulation of
oxycodone hydrochloride indicated for the management of moderate to
severe pain where use of an opioid analgesic is appropriate for more
than a few days."  *Physician's Desk Reference* 2344-46 (52nd ed. 1998).

[15]*Wellbutrin* is used for treatment of depression.  *Physician's
Desk Reference* 1120-21 (52nd ed. 1998).

[16]*Neurontin* is used in the treatment of partial seizures.
*Physician's Desk Reference* 2110-13 (52nd ed. 1998).

Plaintiff was discharged with a rolling walker to use at home
(Tr. 451).

On August 3, 2004, Dr. Nipper completed a medical source
statement in which he indicated that Plaintiff was incapable of
performing sedentary work on a regular and continual basis (Tr.
442-44).  He also indicated that her symptoms would distract her
from adequately performing work or daily activities; the doctor
also stated that, over the history of her illness, there were
times when physical activity would—and would not—cause her to
abandon work or physical activities.  He stated that medications
would not have any significant effect upon her ability to work.
Dr. Nipper found Lumpkin markedly limited in her ability to deal
with stress.  The doctor also stated that there were times when
Plaintiff would have to take unscheduled breaks while attempting
to work; sometimes these breaks would be required hourly and up
to thirty minutes at a time.  Dr. Nipper indicated that she would
mostly likely miss more than three days a month because of her
impairments.  The doctor stated that these impairments predated
his first examination of Lumpkin on November 2002.

On August 24, Lumpkin was seen by Dr. Nipper who noted that
she was on chronic analgesics and used a walker at times (Tr.
464).  Plaintiff stated that her pain was better over the past
three weeks with the increased medications she had been taking
and that her blood pressure had improved as well; her glucose

levels were still up and down.  Lab work from five days earlier
showed that her blood sugar was 477 and her creatinine was 2.1
(Tr. 468).

On September 2, a vascular study showed that the right
basilic vein was marginal but probably adequate; the cephalics
were inadequate (Tr. 465).  On September 29, Dr. Fleet gave
Lumpkin an Imitrex injection and prescribed Lexpro for her
complaints of increased leg pain; the doctor noted an antalgic
gait (Tr. 500-01, 511).

On September 27, Dr. Nipper stated this his opinion of
Plaintiff's medical condition had not changed since his letter of
May 30, 2003 and that he stood by his medical source statement of
August 3, 2004 (Tr. 473A; *cf.* 421, 442-44).

On October 11, 2004, Dr. McDaniel reported problems with her
back, legs, and blood sugar (Tr. 477-79).  Her blood sugar was
700.  The doctor noted cervical adenopathy on the right and that
her thyroid was enlarged two-fold; she had a decrease in light
touch in her feet.  McDaniel diagnosed her to suffer from spinal
stenosis with chronic back pain, diabetes with retinopathy and
peripheral neuropathy, hypothyroid with a goiter, and chronic
renal insufficiency.

On October 27, Lumpkin told Dr. Fleet that her lower back
pain was tolerable with her medications though her neck and
shoulders were stiff and required massage therapy (Tr. 498-99).

An MRI, taken two days later, revealed a 2.5 x 7 millimeter lesion in the basal ganglia on the right which appeared to represent an old lacunar infarct or injury; no other abnormality was noted (Tr. 506). On December 8, Plaintiff told Dr. Fleet that she had to use a walker or she would fall down; she also stated that the OxyContin was not relieving her pain (Tr. 494-95). A carotid doppler study, performed the next day, revealed mild bilateral plaquing, but no hemodynamically significant stenosis (Tr. 507).

On December 30, 2004, Dr. McDaniel reviewed lab results from an emergency room visit to Providence three days earlier which indicated that her blood sugar had been 558 and her creatinine had been 1.8; the glucose level was 206 at the time of her examination (Tr. 474-76, 486). The doctor noted Lumpkin's goiter, decreased feet sensation, and tenderness and decreased range of motion in her back.

In her January 6, 2005 examination with Dr. Fleet, Lumpkin complained of migraine headaches for the previous two weeks; she had received a Demerol shot the previous night (Tr. 492-93). She further stated that her medications were not working and that her lower back pain had increased.

The ALJ summarized the medical evidence, in less detail, as set out above (see Tr. 26-31); he then analyzed the various specific impairments suffered by Plaintiff. He found no basis

24

for finding any severe mental impairment or that her headaches or neck pain were severe (Tr. 32-35).  The ALJ then found Lumpkin capable of performing light work, giving evidentiary weight to the conclusions of Drs. Fontana, Hall, and a non-examining "State Agency medical consultant who reviewed the record as it existed in July, 2003 and determined that the claimant's impairments were not disabling" (Tr. 36; *see generally* Tr. 35-36).

The ALJ discounted the opinions of Drs. McDaniel and Nipper as they did not provide "any opinions regarding specific physical limitations supported by objective clinical examination findings" (Tr. 36-37).  He also gave no evidentiary weight to the treating physicians' opinions because they treated different impairments, because neither treated her for pain, because neither identified the symptoms she suffered which would keep her from working, and because "neither physician has seen the claimant with enough regularity to accurately estimate what the claimant can or cannot do on a daily basis" (Tr. 37).  The ALJ also discounted Lumpkin's statements of pain and limitation (Tr. 38).[17]

The ALJ noted that Plaintiff had "successfully worked in the past without significant difficulty" although she had suffered diabetes most all of her life (Tr. 38).  He found that her

---

[17]The Court has not set out those statements herein, finding it unnecessary in reaching a decision in this action.

hospitalizations, averaging two a year,[18] were caused by separate illnesses or infections that exacerbated her diabetes and quickly resolved (Tr. 39).  The ALJ then found that although Plaintiff had suffered end-organ damage because of her diabetes, her kidneys were stable (*id.*).  He found that she did not suffer "acute or chronic vertebrogenic related disorders in the lumbar spine" (Tr. 40).  The ALJ discounted all opinions that Lumpkin's medications would cause side effects because she never complained of any and because, if she had, "it is expected that Dr. Fleet would seek to ameliorate said effects by certain measures such as switching medications;" in any event, the medication allegation had not been established over a twelve-month period (Tr. 41).  The ALJ then found the vocational expert's testimony that a hypothetical individual who could perform light work could also perform some of the past work performed by Plaintiff as credible (Tr. 41-42).  Based on all of his own determinations, the ALJ concluded that Plaintiff was not—and never was—disabled (Tr. 42).

The Court finds that the conclusions of the ALJ are not supported by substantial evidence.  Specifically, the Court finds it incredible that the ALJ discounted the opinions of Plaintiff's two treating physicians, both specialists in the areas for which they had been treating Lumpkin for several years.  His

---

[18]The ALJ found the hospitalizations to average two a year; the Court's math brings the average to three a year counting only those on the basis of Lumpkin's diabetes.

conclusions are all the more unbelievable in that he based them on the opinion of a non-board-certified general practitioner who found Plaintiff incapable of performing a full range of light work[19] and an orthopedic surgeon who stated that this five foot, one-and-one-half inch, one hundred eight pound woman could occasionally lift one hundred pounds and frequently lift fifty pounds (*see* Tr. 361, 363), two physicians who examined Plaintiff a single time each on what must have been very good days in her adult life.  The Court further notes that the opinion of the non-examining medical examiner cannot be given any value in that it was given based on the evidence that existed in July 2003 which represents, at most, only half of the record evidence and less than one year after the declared disability onset date.

The Court notes that the ALJ failed to acknowledge or assign any evidentiary weight to the opinions of Dr. Fleet who completed an application so that Plaintiff could receive a disability parking tag and treated Lumpkin for pain.  The Court finds that

---

[19]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b) (2001).  Dr. Hall's findings allow for lifting and carrying only up to fifteen pounds on a continuous basis (Tr. 356).

the ALJ has glossed over much of the "nitty-gritty" details
provided throughout this medical record which demonstrate
Plaintiff's deteriorating health.  Specifically, the glucose and
creatinine levels measured out in this report provide ample
evidence that Lumpkin's health, for the period under
consideration, has never been good and has declined at a slow,
but precipitous rate with clear signs of the inevitable undoing
marking the path.  In spite of two treating physicians declaring
that their patient was physically unable to sustain steady,
consistent work habits at a sedentary level and a third treating
doctor who stated that she was disabled after prescribing
narcotic pain medications over a sustained period of time, the
ALJ ignored them and reached his own, unsupported, conclusion.

Based on review of the entire record, the Court finds that
the Commissioner's decision is not supported by substantial evi-
dence.[20]  Therefore, it is recommended that the action be
reversed and remanded to the Social Security Administration for
further administrative proceedings consistent with this opinion,
to include, at a minimum, the taking of additional medical
evidence as to the nature of Plaintiff's impairments.

Furthermore, it is recommended that a final judgment be
entered ordering remand in this action pursuant to sentence four

---

[20]Because the Court reaches the conclusion it has with regard to
Plaintiff's first claim, it is unnecessary to address the two
remaining claims brought by Lumpkin.

of 42 U.S.C. § 405(g).  *See Melkonyan v. Sullivan*, 501 U.S. 89 (1991).  For further procedures not inconsistent with this recommendation, see *Shalala v. Schaefer*, 509 U.S. 292 (1993).

MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.  **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a de novo determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(en banc).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

> A magistrate judge's recommendation cannot be appealed to a

Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **<u>Transcript (applicable where proceedings tape recorded)</u>**. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

DONE this 5th day of July, 2006.


s/BERT W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE